**ORIGINAL**

239

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| GE HEALTHCARE UK LIMITED, | : | CIVIL ACTION |
| Plaintiff/Counterdefendant, | : | No. 09-974-RK |
| v. | : |  |
|  | : | FILED UNDER SEAL |
| BECKMAN COULTER, INC. and BECKMAN COULTER GENOMICS, INC., | : | Unsealed 3/11/2011 |
| Defendants/Counterclaimants. | : |  |
|  | : |  |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                           **DECEMBER 20, 2010**

Presently before the Court are Plaintiff/Counterdefendant GE Healthcare UK Limited

("GE") and Defendants/Counterclaimants Beckman Coulter, Inc. and Beckman Coulter

Genomics, Inc.'s (collectively, "Beckman") Claim Construction Briefs. This Memorandum

addresses the appropriate constructions of the disputed claim terms.

## I.   BACKGROUND

On December 18, 2009, GE filed a patent infringement action against Beckman. The

patents at issue relate to methods to isolate nucleic acids.[1] Specifically, the patents are: (1)

---

[1] The most common nucleic acids are deoxyribonucleic acid (DNA) and ribonucleic acid (RNA). Nucleic acids are the genetic material found in all living things. It is significant to have a method to separate nucleic acids from other compounds in a solution so that they can be utilized in a purified form. This can be done by precipitating the nucleic acids out of solution while leaving behind the other impurities. The precipitated nucleic acids are known as the "precipitate," and once they are brought to the bottom or side of the relevant container, the remaining solution is known as the "supernatant." The supernatant solution can then be discarded, leaving only the nucleic acid precipitate. (GE's Opening Claim Construction Br. at 2-3.)

United States Patent Number 5,523,231 ("the '231 Patent"),[2] entitled "Method to Isolate Macromolecules Using Magnetically Attractable Beads Which Do Not Specifically Bind the Macromolecules" and (2) United States Patent Number 5,681,946 ("the '946 Patent"),[3] entitled "Precipitating Polymers" (collectively, "the Reeve Patents").[4]

On February 11, 2010, Beckman answered and counterclaimed for a declaratory judgment that it does not infringe the Reeve Patents and that the patents are invalid and unenforceable. On July 9, 2010, the parties submitted their Joint Claim Construction Charts and Statements. On August 6, 2010, the parties filed their Claim Construction Briefs. On August 27, 2010, the parties filed Responses to each other's respective Claim Construction Briefs. On September 8, 2010, this Court held a Claim Construction Hearing.

## II.   STANDARDS FOR CLAIM CONSTRUCTION

In order to prevail in a patent infringement action, a plaintiff must show that the patent claim "covers the alleged infringer's product or process." Markman v. Westview Instruments, Inc., 517 U.S. 370, 374 (1996). Thus, the initial step in an infringement analysis focuses on determining the meaning and the scope of the claims of the patent. Wyeth v. Abbott Labs., No. 08-230, 2010 WL 3001913, at *1 (D.N.J. July 28, 2010) (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1995)). Notably, "[c]laim construction is a matter

---

[2] The '231 Patent was issued on June 4, 1996.

[3] The '946 Patent was issued on October 28, 1997.

[4] The inventor associated with both patents is Michael A. Reeve ("Dr. Reeve"). The assignee listed on both Reeve patents is Amersham International plc ("Amersham") – the company that Dr. Reeve worked for as a scientist. Subsequently, GE acquired the Reeve patents from Amersham and now accuses Beckman of patent infringement in this action.

of law . . . therefore, it is '[t]he duty of the trial judge . . . to determine the meaning of the claims at issue.'" Id. (citing Exxon Chem. Patents, Inc. v. Lubrizoil Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995)).

In Phillips v. AWH Corp., the United States Court of Appeals for the Federal Circuit ("Federal Circuit") emphasized that "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d 1303, 1312 (internal quotations omitted) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention."). Generally, the words of a claim are given their "ordinary and customary meaning," which is defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (citations omitted). In this regard, the Federal Circuit has noted the following:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention-the inventor's lexicography-must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

Importantly, in determining the meaning of a claim as understood by a person of ordinary skill in the art, the court may look to various sources from which the proper meaning may be discerned. Wyeth, 2010 WL 3001913, at *2. Specifically, "[t]hese sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic

3

evidence concerning relevant scientific principles, the meaning of technical terms, and the state

of the art .'" Phillips, 415 F.3d at 1314 (citations omitted). "While a court is permitted to turn to

extrinsic evidence, such evidence is generally of less significance and less value in the claim

construction process. Extrinsic evidence would include evidence that is outside the patent and

prosecution history, and may include expert testimony, dictionaries and treatises." Wyeth, 2010

WL 3001913, at *2. As courts have explained, "[s]uch evidence, though 'shed[ding] useful light

on the relevant art,' is 'less significant than the intrinsic record in determining the legally

operative meaning of claim language,' and 'is unlikely to result in a reliable interpretation of

patent claim scope unless considered in context of the intrinsic evidence.'" Eppendorf AG v.

Nanosphere, Inc., No. 09-0504, 2010 WL 2757097, at *2 (D. Del. July 12, 2010) (citing Phillips,

415 F.3d at 1317-19).

## III.    DISCUSSION

The parties have identified several disputed claim terms in both the '231 and '946

Patents.[5] These claim terms all appear in claim 1 of the '231 Patent and/or claim 1 of the '946

Patent. These claims state:

### '231 Patent, claim 1

A method of making a product solution containing a nucleic acid by treating a
starting solution containing the nucleic acid by the use of *suspended* magnetically
attractable *beads which do not specifically bind the nucleic acid*, comprising the
steps of:

> precipitating the nucleic acid out of the starting solution in the presence of
> *suspended* magnetically attractable beads whereby a nucleic acid

---

[5] Notably, because the '231 and '946 Patents are related and have virtually identical
specifications, the Court will solely provide and line numbers for the '231 Patent when referring
to language in both Reeve Patents.

precipitate *becomes aggregated with and entraps the beads*,

applying a magnetic field to draw down the precipitate of the nucleic acid and the entrapped beads and to form a first supernatant liquid,

separating the precipitate and the entrapped beads from the first supernatant liquid,

adding a liquid to the precipitate and the entrapped beads to re-dissolve the nucleic acid and *re-suspend the beads*,

applying a magnetic field to draw down the beads and to form a second supernatant liquid, and

separating from the beads the second supernatant liquid as said product solution containing the nucleic acid.

('231 Patent at claim 1, 12:20-41 (emphasis added to highlight disputed claim terms).)

### '946 Patent, claim 1

A method of making a product solution containing a nucleic acid by treating a starting solution containing the nucleic acid by the use of *suspended* magnetically attractable *beads which do not specifically bind the nucleic acid*, comprising the steps of:

precipitating the nucleic acid out of the starting solution in the presence of the *suspended* magnetically attractable beads whereby a nucleic acid precipitate *becomes non-specifically associated with the beads*,

applying a magnetic field to draw down the precipitate of the nucleic acid and the associated beads and to form a first supernatant liquid,

separating the precipitate and the associated beads from the first supernatant liquid,

adding a liquid to the precipitate and the associated beads to re-dissolve the nucleic acid and *re-suspend the beads*,

applying a magnetic field to draw down the beads and to form a second supernatant liquid, and

separating from the beads the second supernatant liquid as said product

solution containing the nucleic acid.

('946 Patent at claim 1, 12:18-40 (emphasis added to highlight disputed claim terms).)

The Court will now address each of these disputed terms in the Reeve Patents.

A.   **Disputed Claim Term: "Beads Which Do Not Specifically Bind the Nucleic Acid" ('231 Patent, Claim 1; '946 Patent, Claim 1)**

| Term | | GE's Construction | Beckman's Construction |
|------|---|------|------|
| "beads which do not specifically bind the nucleic acid" | | beads that do not attach to the nucleic acid in a way that is governed by the particular structure of that particular nucleic acid. | particles that are inert or do not have an affinity for nucleic acids. |

The Court agrees with GE that the language at issue – "beads which do not specifically bind the nucleic acid" – "distinguishes the claimed invention from methods using magnetic beads that 'specifically' bind nucleic acids." (GE's Claim Construction Br. at 5.) The intrinsic evidence clearly indicates that the difference between *"specific"* and *"non-specific"* binding or association is significant in regard to the Reeve Patents. In fact, the title of the '231 Patent is "Method to Isolate Macromolecules Using Magnetically Attractable Beads Which *Do Not Specifically* Bind the Macromolecules." ('231 Patent at Title, 1:1-5 (emphasis added).) Further, the "Summary of the Invention" section of the Reeve Patents states:

> It is a feature of the invention that the magnetic beads *do not specifically* bind the polymer. By this feature, the present invention is distinguished from many prior techniques which involve providing a coating on the surface of magnetic beads designed to *specifically* bind the substance to be drawn down out of solution. When the polymer is precipitated out of solution in the presence of the suspended magnetic beads, it becomes *non-specifically* associated with the beads.

('231 Patent at Summary of the Invention, 3:27-35 (emphasis added).) Finally, as will be discussed infra, the disputed claim term "becomes *non-specifically* associated with the beads"

was added to the claims of the later '946 Patent. ('946 Patent at claim 1, 12:27 (emphasis added).)

The use of these terms in the intrinsic evidence is not limited to the language of the Reeve Patents. In the "Reasons for Allowance" of the '231 Patent, the Patent and Trademark Office ("PTO") Examiner ('231 Examiner) stated: "The magnetic particles of the present invention ***do not specifically*** associate with the precipitated biopolymer . . . ." (GE's Claim Construction Br., Ex. 5 at 2 (emphasis added).) Moreover, in a "Response" to the PTO, during prosecution for the '231 Patent, the patentee stated: "The method involves the separate step of precipitating the polymer out of solution, whereby it becomes ***non-specifically*** associated with the beads." (Id., Ex. 8 at 6 (emphasis added).) We find that this "specific" versus "non-specific" language would have been important to one skilled in the art at the time in question in regard to the '231 and '946 Patents.

The patents do not provide definitions for specific or non-specific binding and/or association. However, the law is clear that "the words in a claim are generally given their ordinary and customary meaning" unless the patentee uses "terms in a manner other than their ordinary meaning." Vitronics, 90 F.3d at 1582 (citing Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996)) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning.").

In its briefing, GE contends the meaning of the terms and the important "distinction between specific and non-specific is confirmed by the patents Beckman relies upon to support its

invalidity and noninfringement contentions." (GE's Claim Construction Br. at 6.) Specifically, the "Vorpahl" patent, which was filed in 1989 and considered prior art, defines specific binding as "the specific recognition of one of two different molecules for the other to the exclusion of other molecules," and non-specific binding as "relatively independent of specific surface structures." (Id., Ex. 3 at 14:15-33.) In addition, the "Hawkins" patent, which is not prior art, defines "non-specific DNA binding" as "binding of different DNA molecules with approximately the same affinity to magnetic microparticles despite differences in the nucleic acid sequence or size of the different DNA molecules." (Id., Ex. 4 at 4:18-21.) Along with offering insight into the meaning of the terms in the relevant field, these definitions confirm that the terms specific binding and non-specific binding were known in the biochemistry and molecular biology fields both before and after the Reeve Patents were approved.

As the Phillips court found, "[e]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue . . . *or to establish that a particular term in the patent or prior art has a particular meaning in the pertinent field*." Phillips, 415 F.3d at 1318 (Fed. Cir. 2005) (emphasis added). GE's expert, Eric T. Kool, Ph.D ("Dr. Kool"), opines on the ordinary and customary meaning of specific and non-specific binding in his Declaration. Dr. Kool states:

> A person of ordinary skill in the art in 1990 would have understood the term . . . of 'specific binding.' Specific binding is binding or attachment that is governed by the particular structure of the particular chemical being bound. Likewise, 'non-specific binding' is binding or attachment that is not governed by the particular structure of the particular chemical being bound.

(Dr. Kool Decl. ¶ 32.) Importantly, Beckman's expert, Nicholas V. Hud, Ph.D ("Dr. Hud"), acknowledges throughout his Declaration that the terms have meanings in the pertinent field, but

8

do not provide a clear interpretation for this Court. (Hud Decl. ¶ 6 ("Furthermore, I do not believe that GEHC's proposed construction provides any clarity as to the scope of the claims in question, most significant with respect to the distinction between specific and non-specific binding.").)

GE contends that its proposed construction – "beads that do not attach to the nucleic acid in a way that is governed by the particular structure of that particular nucleic acid" – captures the ordinary and customary meaning of "specific binding" in non-technical terms and would assist the jury in this case. The Court agrees. Based on the aforementioned intrinsic and extrinsic evidence, we find that the meanings of the terms "specific" and "non-specific" binding are significant in regard to the Reeve Patents. GE has provided a proposed construction for this claim term that provides the ordinary and customary meaning of "specific binding." This definition is supported by relevant prior art, the "Vorpahl" patent, which differentiated specific and non-specific binding in a similar fashion. (Id., Ex. 3 at 14:15-33.) Further, the definition is supported by relevant extrinsic evidence in the form of an expert declaration.[6] (Dr. Kool Decl. ¶ 32.)

Beckman proposes that the Court construe this claim term as "particles that are inert or do not have an affinity for nucleic acids." We have several issues with this recommended construction. As an initial matter, the use of the term "inert"[7] in this construction would

---

[6] As discussed below, while the Court will accept the portion of GE's proposed construction that addresses the ordinary and customary meaning of "specific binding," we will not use the term "attach" as opposed to "bind" as part of this construction.

[7] "Inert" is defined as "[d]isplaying no chemical activity." Webster's II New Riverside Dictionary 624 (1988). Beckman makes clear in its briefing its intent to define "inert" in this manner: "Because the beads are *inert (not chemically reactive)* or do not have affinity for the

effectively read "specifically" out of the language at issue.  It is well-established that "claims are

interpreted with an eye toward giving effect to all terms in the claim."  Bicon, Inc. v. Straumann

Co., 441 F.3d 945, 950 (Fed. Cir. 2006).  As established by the intrinsic evidence, the terms

"non-specific" and "specific" are important in regard to the Reeve Patents.  Further, as indicated

by the extrinsic evidence, these terms have particular meanings in the pertinent field.

The language in the Reeve Patents does not suggest that there is no binding at all between

the beads and the nucleic acids during the outlined process.  Indeed, it suggests the opposite is

possible – that there is a non-specific association[8] between the beads and the nucleic acid.  ('231

Patent at Summary of Invention, 2:46-47 ("precipitating the polymer out of solution whereby it

becomes non-specifically associated with the beads."); 3:32 ("When the polymer is precipitated

out of solution in the presence of the suspended magnetic beads, it becomes non-specifically

associated with the beads."); '946 Patent at claim 1, 12:24-27 ("precipitating the nucleic acid out

of the starting solution in the presence of the suspended magnetically attractable beads whereby a

nucleic acid precipitate becomes non-specifically associated with the beads.").)  Importantly,

when the patentee wanted to say there was no interaction at all, he made that explicitly clear in

the patent language.  '231 Patent at Summary of the Invention, 3:32-38 ("When the polymer is

precipitated out of solution in the presence of the suspended magnetic beads, it becomes non-

specifically associated with the beads . . . . But when in solution, ***the polymer does not become***

---

nucleic acids . . . ." (Beckman's Claim Construction Br. at 12 (emphasis added).)

[8] Non-specific association can include chemical interactions.  (Kool Decl. ¶ 67.)

*associated with the beads*." (emphasis added).)[9]

In addition, Beckman's assertion that the beads must be inert is inconsistent with the specification language in the Reeve Patents. Specifically, both the '231 and '946 Patents teach that "the nature of the magnetic beads is not critical." ('231 Patent at Summary of Invention, 2:52-53.) The specification does mention that the beads may be encapsulated in inert organic polymer. (Id. at 2:54-57.) However, it also teaches that "the organic polymer may be omitted." (Id. at 2:58.) Beckman's construction attempts to improperly exclude an embodiment – the use of chemically active and non-inert beads – which is not excluded by the language of the Reeve Patents themselves.

Finally, Beckman's use of the word "affinity" is unsupported. The term does not appear in the intrinsic record and it is only mentioned once in product literature associated with a commercial embodiment. (Beckman's Claim Construction Br., Ex. 9 at 11.) Commercial embodiments, however, are merely examples of an invention that cannot be used to narrow claims when there is no indication in the patent language of that intent. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339-40 (Fed. Cir. 2005).

Beckman primarily relies on one sentence from the '231 Patent prosecution history to support its proposed construction. In a response submitted to the PTO, the patentee stated:

---

[9] The Court agrees with Beckman that antibody/attachment and covalent bonding were clearly excluded during the prosecution of the '231 Patent. (GE Claim Construction Br., Ex. 5 at 2.) However, as GE emphasized during the claim construction hearing, adsorption is a particular type of non-specific binding that is not excluded by the Reeve Patents. Contrary to Beckman's arguments, the prosecution history indicates that adsorption is possible – when the polymer is precipitated out of solution through the patented Reeve method (Id., Ex. 8 at 6 ("In contrast, the method of the present invention involves the use of magnetic beads which do not adsorb the biopolymer, at least not while the polymer remains in solution. This method involves the separate step of precipitating the polymer out of solution, whereby it becomes non-specifically associated with the beads.").) Beckman's expert, Dr. Hud, agrees that "adsorption typically refers to 'non-specific' binding to a solid surface." (Dr. Hud Decl. ¶ 20.)

"Applicants method and reagents use inert non-binding magnetic particles to achieve not only separation but also recovery of nucleic acids." (Beckman's Claim Construction Br., Ex. 4 at 8.) It is well-settled that any disavowal of claim scope must be clear and unmistakable. <u>Purdue Pharma L.P. v. Endo Pharms. Inc.</u>, 438 F.3d 1123, 1136 (Fed. Cir. 2006) ("Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution.") Given the context of the statement and the fact that the patentee stated that "[t]he method involves the separate step of precipitating the polymer out of solution, whereby it becomes non-specifically associated with the beads" in the same submission, the Court finds that the reference to "inert non-binding magnetic particles" was not a "clear and unmistakable" disavowal of scope. (Beckman's Claim Construction Br., Ex. 4 at 6.) There was certainly no explicit or implicit statement in this PTO submission, the '231 Patent, the '946 Patent, or any of the intrinsic evidence related to the Reeve Patents, indicating that the patented methods would only work with "inert nonbinding" beads.

Beckman also relies on the recent deposition testimony from the inventor, Dr. Reeve, where he stated:

> [T]he driving force for the process is that nucleic acids, when they are out of solution, stick to each other, and that if you put particles such as these magnetically attractable beads which do not specifically bind nucleic acid, dispersed throughout the solution, they will become entangled in the aggregated nucleic acid. They don't play an active role in the binding of the nucleic acid to the beads. The process is driven by precipitation of the nucleic acid.

(<u>Id.</u>, Ex. 17 at 12:22-13:7.) As a preliminary matter, this extrinsic evidence cannot be used to contradict the intrinsic evidence – which in this case establishes that non-specific interactions between the nucleic acids and beads was encompassed by the '231 and '946 Patents – even if it cannot be labeled as the "driving force" for the process. <u>Vitronics</u>, 90 F.3d at 1584. In addition, the Federal Circuit has stated that "an inventor is not competent to construe patent claims"

because the claims are commonly drafted by the inventor's patent solicitor or the patent examiner and, therefore, "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO." Solomon v. Kimberly-Clark Corp., 216 F.3d 1372, 1379 (Fed. Cir. 2000) (citations omitted). Moreover, during his deposition, Dr. Reeve also acknowledged the possibility of chemical interactions between the nucleic acids and beads. For instance, he stated: "You can't say there is no interaction because, you know, that would be absurd because there would be Van der Waals forces, interactions, electrostatic interactions and repulsions." (GE's Claim Construction Br., Ex. 13 at 16:15-19.) This specific testimony clearly cuts against Beckman's argument that the claim language at issue is referring to *only* "inert" beads.

The term "attach" is the only term that the Court will not adopt from GE's proposed construction. Constant Compliance, Inc. v. Emerson Process Mgmt. Power & Water Solutions, Inc., 598 F. Supp. 2d 842, 847 (N.D. Ill. 2009) ("While this Court does have 'an independent obligation to construe the terms of a patent, [it] need not accept the construction proposed by either party.'") (citing Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1323-24 (Fed. Cir 2008)). GE bases its argument that "attach," as opposed to "bind," should be used on the following argument and expert support: "A person of ordinary skill would have understood 'bind' and 'attach' to be synonymous in this context. When substances, like the beads and nucleic acids disclosed in the patents, bind each other, they function as one unit to each other." (GE's Claim Construction Br. at 7 (citing Dr. Kool Decl. ¶ 44).) These are insufficient reasons to use the word "attach" for these claim terms. Indeed, because the terms "attach" and "bind" are synonymous in this context, there is no reason for the Court to adopt this aspect of GE's proposed construction.

In conclusion, we construe "beads which do not specifically bind the nucleic acid" as

13

follows: beads that do not bind to the nucleic acid in a way that is governed by the particular structure of that particular nucleic acid.

**B.**   **Disputed Claim Term: "Becomes Aggregated With and Entraps The Beads"**
**('231 Patent, Claim 1)**

| Term | GE's Construction | Beckman's Construction |
|------|-------------------|------------------------|
| "becomes aggregated with and entraps the beads." | clusters with and traps the beads.<br><br>(GE contends that this claim language does not need to be construed.) | clusters together and surrounds the beads such that the beads are passively enmeshed in the precipitate. |

GE contends that the words in this claim term are used with their ordinary meaning and do not need to be construed because they are understandable to scientists and non-scientists alike (GE's Claim Construction Br. at 10-11.); see also Appelra Corp. v. MicroMass, UK Ltd., 186 F. Supp. 2d 487, 524-26 (D. Del. 2002) (declining to construe terms "maintain," "maintaining, " and a "whereby" clause because they were clear on their face); Zip Dee, Inc. v. Dometic Corp., 63 F. Supp. 2d 868, 872 (N.D. Ill. 1998) ("Here too no Markman-type construction seems to be required that would add a definition beyond the ordinary English language meaning of the term 'tension' . . . . In short, the [patent's] references to 'tension' will go to the jury without the interposition of any judicial gloss."). Alternatively, GE argues that the term should be interpreted as "clusters with and traps the beads."

We partially agree with GE's position regarding this claim language. Specifically, we agree that the term "entraps" does not need to be construed. The term "entrapped beads" appears three times in claim 1 of the '231 Patent subsequent to the claim language at issue. Importantly, however, the parties do not ask for this subsequent language to be construed by the Court. The use of this undisputed "entrapped" language throughout the rest of claim 1 suggests that the term

is understandable and familiar to one skilled in the art – as well as ordinary laymen. In addition, the Court declines to construe "entraps" as "traps" because the dictionary definitions of the words are identical and there is no indication that the terms would have any different meaning in this context. Webster's II New Riverside Dictionary 436, 1229 (1988) (defining "entrap" and "trap" as "to catch in or as if in a trap."). The Court, however, will interpret the phrase "aggregated with" as "clusters with" because the parties agree that "clusters" can be construed as "aggregated." We find that the term "clusters" better describes the reaction between the nucleic acids and the beads. Further, the term will be more understandable to the jury. We also find that use of the term "with" is appropriate because the language as a whole – "whereby a nucleic acid precipitate becomes aggregated *with* and entraps the beads" – describes an interaction between the beads and nucleic acid. ('231 Patent at claim 1, 12:27-28.)

The Court declines to adopt Beckman's proposed construction – "clusters together and surrounds the beads such that the beads are passively enmeshed in the precipitate" – because this proposal imports unsupported limitations into the claim term. First, Beckman has not provided sufficient support for the concept that the precipitated nucleic acid "surrounds" the beads. The word "surround" suggests complete encirclement on all sides of the beads. Webster's II New Riverside Dictionary 1166 (1988) (defining "surround" as "[t]o encircle on all sides of simultaneously."). The example embodiments in the '231 and '946 specifications consistently state that the nucleic acid aggregates "around" the beads, but do not refer to "surrounding." ('231 Patent at Detailed Description of the Invention, 4:15-16 ("The precipitated nucleic acid aggregates around the suspended magnetic beads."); 4:30-31 ("The nucleic acid therefore remains aggregated around the magnetic beads during washing."); 5:9-10 (The precipitated protein and nucleic acid aggregate around the suspended magnetic beads . . . .").) Moreover, the

15

figures in the patents – even though they are only examples of the process and not drawn completely to scale – consistently show that the beads are entrapped without being surrounded on all sides. See, e.g., '231 Patent at Figure 1a. A person skilled in the art would simply not infer from this claim language that the nucleic acid needs to encircle the beads on all sides. Thus, we refuse to use the term "surround" as a part of this construction.

Second, Beckman's use of the language "enmeshed in the precipitate" is unsupported. Beckman has not directed the Court to any intrinsic or extrinsic evidence that supports using this phrase as part of the construction. In fact, as GE points out, use of this ambiguous term would merely "threaten to require the Court to engage in a construction within a construction to simplify it for the factfinder." (GE's Claim Construction Br. at 13.) As a result, we reject this language.

Third, we decline to accept Beckman's argument that the beads must be "passively" enmeshed in the nucleic acid precipitate. Beckman's proposal to use the term "passively" is essentially based on its argument regarding the first disputed claim term – that the beads must be "inert or do not have an affinity for nucleic acids." According to Beckman, "[b]ecause the beads are inert (not chemically reactive) or do not have affinity for the nucleic acids . . . , the entrapment by the precipitate of the claimed beads is passive, physical entrapment, not a chemical interaction." (Beckman's Claim Construction Br. at 12.) As discussed above, the Court rejects Beckman's argument that the Reeve Patents excluded the use of non-inert beads – beads which do not have a chemical interaction with the nucleic acids. In addition, the word "passively" does not appear in language of the Reeve Patents or any of the intrinsic evidence.[10]

_____

[10] Beckman cites to extrinsic evidence, including a dissertation by a Ph.D student (Rachel Brewer) who was supervised by Dr. Reeve – which refers to "passive entrapment" – to support its use of the term "passively." (Beckman's Claim Construction Br., Ex. 12 at 19.) However,

The Court finds that use of the word "passively" as part of the claim construction would insert a limitation that is unsupported by the evidence.

In conclusion, we construe "becomes aggregated with and entraps the beads" as follows: clusters with and entraps the beads.

**C.**   **Disputed Claim Term: "Becomes Non-Specifically Associated With The Beads" ('946 Patent, Claim 1)**

| Term | GE's Construction | Beckman's Construction |
|------|-------------------|------------------------|
| "becomes non-specifically associated with the beads" | interacts with the beads in a way that is not governed by the particular structure of that particular nucleic acid. | 1. indefinite<br><br>2. clusters together and surrounds the beads such that the beads are passively enmeshed in the precipitate. |

In regard to this disputed claim term, Beckman's primary position is that this term in the '946 Patent is indefinite under 35 U.S.C. § 112 ¶ 2 and incapable of construction.[11] Indefiniteness is a question of law. Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1348 (Fed. Cir. 2005). The second paragraph of 35 U.S.C. § 112 mandates that the specification of every patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2.

---

extrinsic evidence cannot be used to contradict the intrinsic record. Vitronics, 90 F.3d at 1584. Further, Ms. Brewer's statement was made in the context of a commercial embodiment and not the claimed invention as a whole. These embodiments cannot be used to narrow claims when there is no indication in the patent language of that intent. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339-40 (Fed. Cir. 2005).

[11] The parties agreed that Beckman's arguments regarding indefiniteness at the claim construction phase would be limited to the briefing in the claim construction briefs, and would not encompass the arguments set forth in Beckman's Motion for Summary Judgment (Doc. No. 58). We will address the Motion for Summary Judgment of Invalidity through a separate Memorandum and Order.

"This requirement serves a public notice function, ensuring that the patent specification adequately notifies the public of the scope of the patentee's right to exclude." Praxair, Inc., 543 F.3d at 1319 (Fed. Cir. 2008).

A claim meets the definiteness requirement of § 112 "[i]f one skilled in the art would understand the bounds of the claim when read in light of the specification." Exxon, 265 F.3d at 1375 (Fed. Cir. 2001). Indefiniteness is proven only "where an accused infringer shows by *clear and convincing* evidence that a skilled artisan could not discern the boundaries of the claim" based on the intrinsic evidence or knowledge of the relevant art area." Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (emphasis added). Specifically, a claim will be found indefinite only if it "is insolubly ambiguous, and no narrowing construction can properly be adopted . . . ." Exxon, 265 F.3d at 1375. In contrast, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, [the Federal Circuit has] held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Id.

In support of its "indefinite" argument regarding the '946 Patent, Beckman relies heavily on the fact that the *'231 Examiner* recommended changes to "improve definiteness," and that one of the changes the applicant made in response was to change the claim language from "non-specifically associated with" to "aggregated with and entraps." (Beckman Claim Construction Br., Ex. 29 at 1; Ex. 30 at 1-2.) As a threshold matter, this intrinsic evidence concerns the '231 Patent rather than the '946 Patent. In addition, as GE notes: "[A] comment regarding 'improving definiteness' does not mean that the claims were fatally indefinite. *The '231 Examiner never entered a claim rejection on the ground that 'becomes non-specifically associated with the beads' was indefinite*. And the Examiner never objected to the use of this phrase in several

18

places in the specification." (GE's Claim Construction Br. at 15 n.8 (emphasis added).)

Significantly, Beckman also ignores the fact that the '231 Examiner himself stated the following in the "Reasons for Allowance": "The magnetic particles of the present invention ***do not specifically associate*** with the precipitated biopolymer by antibody/antigen attachment or by any covalent bonding, as in the prior art." (GE's Claim Construction Br., Ex. 5 at 2 (emphasis added).) At the very least, this statement reflects that the Examiner understood the meaning of the terms specific and non-specific association, their importance in regard to the '231 Patent, and that the concepts factored in the decision to approve the patent application. The statement also supports GE's contention that the similar language used in the '946 Patent – "becomes non-specifically associated with the beads " – was well understood by persons of ordinary skill in the art during the time period at issue. (GE's Claim Construction Br. at 16 ("The ultimate question for indefiniteness is whether a person of ordinary skill in the art would have understood what it means to "become[] non-specifically associated with the beads . . . . The words "specifically" and "non-specifically" on which this claim term is built have a common and well-understood meaning.").)[12]

Beckman also cites to Dr. Reeve's deposition to support its "indefinite" argument. Specifically, Beckman argues: "In short, Dr. Reeve was unable to define the scope of "non-specifically associated with" in claim 1 of the '946 patent without reference to aggregation around and entrapment of the beads (limitations of claim 1 of the '231 Patent)." (Beckman's Resp. to GE's Claim Construction Br. at 15.) The Federal Circuit, however, has made clear that

_____

[12] As explained in Section III.A., the "Vorphal" and Hawkins" patents support that the meanings of "specific" and "non-specific" interactions are known by persons of ordinary skill in the art.

"[i]t is particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under [35 U.S.C. § 112, ¶ 2] in view of the absence of probative value of such testimony." Solomon, 216 F.3d at 1379-80; see also Markman, 52 F.3d 967, 985 (Fed. Cir. 1995) ("[C]ommonly the claims are drafted by the inventor's patent solicitor and they may even be drafted by the patent examiner in an examiner's amendment (subject to the approval of the inventor's solicitor) . . . . While presumably the inventor has approved any changes to the claim scope that have occurred via amendment during the prosecution process, it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO."). Further, as GE noted at the Claim Construction Hearing, Beckman minimizes a portion of Dr. Reeve's testimony where he explained his interpretation of "non-specifically associated" and confirmed the importance difference between "specific" and "non-specific" interactions. Dr. Reeve testified: "So associated means that they are just there together in the same place in space. It is nonspecific because it is not driven by some special property of the surface, which is something you have been alluding to in many of these questions." (Beckman's Claim Construction Br., Ex. 17 at 190:3-8.)[13]

At this stage in the litigation, Beckman has not shown by "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim." Halliburton, 514 F.3d at

---

[13] Beckman argues that GE has not made "any effort to explain *what interaction* in the context of the claimed processes would be non-specific association and *not* entrapment." (Beckman's Resp. to GE's Claim Construction Br. at 16 (emphasis in original).) To the contrary, GE has explained that adsorption is a particular type of non-specific interaction that is encompassed by the Reeve Patents. Claim Construction H'rg Tr. at 95-97 ("There is no doubt that adsorption was known in the art as a form of nonspecific association which could be used for this process, and it's different from entrapment and aggregation.").

1249-50. As discussed earlier, the intrinsic and extrinsic evidence clearly indicates that the difference between "specific" and "non-specific" binding or association is significant in regard to the '946 Patent and that the terms have clear meanings and are used by those skilled in the field. In addition, GE has provided this Court with examples – such as adsorption – of chemical interactions between the beads and nucleic acids that are encompassed by the claim language beyond mere entrapment and aggregation. Thus, we reject Beckman's contention that this claim term is indefinite.

For the same reasons, we find that GE's proposed construction – "interacts with the beads in a way that is not governed by the particular structure of that particular nucleic acid" – should be adopted. We note that the adoption of GE's proposed construction is particularly appropriate given how closely related this claim language is to the first disputed claim term.[14] Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1346 (Fed. Cir. 2008) ("[a]n ordinarily skilled artisan would simply not construe similar terminology so differently from one usage to another."). We reject Beckman's recommended construction – "clusters together and surrounds the beads such that the beads are passively enmeshed in the precipitate" – for the same reasons discussed in Section III.B.

In conclusion, we construe "becomes non-specifically associated with the beads" as follows: interacts with the beads in a way that is not governed by the particular structure of that particular nucleic acid.

---

[14] Dr. Kool opines: "This claim term builds on the concept of 'specific' binding or association which . . . was well known to persons of ordinary skill in the art." (Dr. Kool Decl. ¶ 65.) As discussed earlier, "[e]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue . . . *or to establish that a particular term in the patent or prior art has a particular meaning in the pertinent field*." Phillips, 415 F.3d 1303, 1318 (emphasis added).

**D.**    <u>Disputed Claim Terms</u>: "Suspended" and "Re-suspend the Beads" ('231 Patent, Claim 1; '946 Patent, Claim 1)

| Term | GE's Construction | Beckman's Construction |
|------|-------------------|------------------------|
| "suspended" | dispersed | thoroughly dispersed throughout the solution in the absence of a magnetic field. |

| Term | GE's Construction | Beckman's Construction |
|------|-------------------|------------------------|
| "re-suspend the beads" | re-disperse | thoroughly re-disperse the magnetic beads throughout the solution in the absence of a magnetic field. |

The Court will discuss the final two disputed claim terms together consistent with the parties' approach in briefing. As discussed below, we do not accept either party's proposed constructions in totality. The final claim constructions, however, are a combination of the parties' recommended constructions.

The claims use "***suspended***" to refer to the "suspended magnetically attractable beads" in the presence of which the nucleic acid is precipitated, and the language "***re-suspend the beads***" to describe the step of re-dissolving the precipitated nucleic acid. GE agrees with Beckman that "disperse" is an acceptable construction of "suspend" regarding the disputed claim language. Nevertheless, it objects to Beckman's alleged attempt to "inject additional limitations into the claims . . . ." (GE's Claim Construction Br. at 18.) First, GE takes issue with Beckman's suggestion that the beads must be "thoroughly" dispersed and re-dispersed "throughout the solution." Second, GE disagrees that both aspects of the process must take place "in the absence of a magnetic field." The Court will now address each of the suggested "limitations" proposed by Beckman.

22

Beckman's use of the language "thoroughly" and "throughout the solution" lacks adequate support in the intrinsic evidence. Beckman has not directed this Court to any place in the Reeve Patents where this language is used. Beckman, however, does argue that the each of the Figures in the Reeve Patents illustrate that the beads are "thoroughly dispersed" during the relevant steps.[15] (See, e.g., '231 Patent at Figure 1a; steps 2-3 and 7.) Nonetheless, while these figures appear to indicate such a dispersion, none of the detailed written examples in the specification suggest that the beads need to be dispersed "thoroughly" or "throughout the solution" during either of these steps. For example, Example 1 in the specification simply states to "mix" the beads into the starting solution; there is no requirement to mix "thoroughly" or "throughout the solution." ('231 Patent at Example 1, 8:62-9:5.)

Beckman cites Abbott Labs v. Sandoz, Inc. for the proposition that the "court may reach a narrower construction, limited to the embodiment(s) disclosed in the specification, when the [intrinsic evidence] clearly indicates that the invention encompasses no more than that confined structure or method." 566 F.3d 1282, 1288 (Fed. Cir. 2009). Here, there is certainly no clear indication from the illustrative figures or written examples that the beads need to be dispersed "thoroughly" or "throughout the solution." A person of ordinary skill in the art would not have interpreted these limitations into the disputed claim terms based on the intrinsic evidence.

The relevant extrinsic evidence also fails to support Beckman's proposal to read "thoroughly" and "throughout the solution" into the claim terms at issue. For instance, both experts agree that a uniform distribution of the beads is not necessary. (Dr. Kool Decl. ¶ 75; Dr. Hud Decl. ¶ 31.) Dr. Kool, GE's expert, declares:

---

[15] The specification makes clear that the figures are only "examples." ('231 Patent at Brief Description of the Drawings, 3:54-67.)

> For example, "thoroughly" and "throughout the solution" suggest that Beckman will argue that *complete, uniform distribution of particles is required by the patents when it is not.* Moreover, such complete, uniform distribution is unlikely as a practical matter to occur given imperfect mixing and the action of gravity. One of skill in the art would understand that *the invention works without uniform distribution.* Even if the beads were not uniformly distributed (for example, some beads are located more on the right side or left side of the tube or more at the top or bottom) the invention would still work.

(Dr. Kool Decl. ¶ 75.) Dr. Hud, Beckman's expert agrees that a "*complete, uniform distribution*"[16] is not required pursuant to the claim language at issue. (Dr. Hud Decl. ¶ 31.). In addition, he did not refute Dr. Kool's opinion that the invention would work even if some beads were located more on one side of the tube. (Id.)[17]

Additionally, the dictionary definitions that Beckman relies upon do not support its proposed construction. As Beckman notes, "[t]he Court may 'rely on dictionary definitions when construing claim terms, so long as the dictionary definitions do[] not contradict any definition

---

[16] Dr. Hud opines: "I believe that one of skill in the art would not understand the term "thorough" – in the context of the Reeve process – to mean theoretically complete and uniform as suggested by Dr. Kool. Rather, the skilled artisan would appreciate that the more thoroughly dispersed the beads were throughout the solution, the better the process would work and that the optimal conditions are illustrated in Figure 1a." (Dr. Hud Decl. ¶ 31.) Beckman contends that the Court should reject GE's proposed construction because it is ambiguous and creates more questions than answers. However, to the extent Beckman is arguing that the claim language should be construed as requiring that the beads must be dispersed to some nebulous degree *close* to complete and uniform, the Court finds that Beckman's construction would be ambiguous.

[17] Beckman also cites to Dr. Reeve's deposition testimony where he explained his patented process and referred to beads "dispersed throughout the solution," described how "the magnetic particles are as dispersed in space as you can practically make them," and answered "yes" when asked if the magnetic particles are uniformly dispersed throughout the solution." (Beckman's Claim Construction Br., Ex. 17 at 13:2-3, 27:21-24, 29:13-19.) As described earlier, "an inventor is not competent to construe patent claims" because the claims are commonly drafted by the inventor's patent solicitor or the patent examiner and, therefore, "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO." Solomon, 216 F.3d at 1379 (Fed. Cir. 2000) (citations omitted). In addition, in contrast to this testimony, when asked if his process would work if the beads were "not uniformly dispersed," Dr. Reeve responded: "Your yield would go down. It is not an all or nothing process." (Id. at 28:9-15.)

24

found in or ascertained by a reading of the patent documents.'" Phillips, 415 F.3d at 1322-23

(quoting Vitronics, 90 F.3d at 1584). Beckman argues that both parties' scientific dictionaries

support its recommended claim construction. Specifically, Beckman contends:

> The Academic Press Dictionary of Science and Technology, relied upon by [GE],
> defines 'suspension' as 'a system in which very small particles of solid, semisolid,
> or liquid material are **more or less evenly dispersed** in a liquid or gas phase . . . .'
> Similarly, Hawley's Condensed Chemical Dictionary, on which Beckman relies,
> defines 'suspension' as 'a system in which very small particles (solid, semisolid,
> or liquid) are **more or less uniformly dispersed** in a liquid or gaseous medium . . .
> .' Confirming the intrinsic evidence, these definitions require that the beads be
> '**more or less uniformly dispersed**' consistent with Beckman's proposed
> construction 'thoroughly dispersed throughout the solution.'"

(Beckman's Claim Construction Br. at 19 (citations omitted) (emphasis added).) Even these

dictionary definitions relied upon by Beckman do not suggest that "suspension" requires uniform

dispersion – as evidenced by use of the language "more or less."

  In sum, based on the intrinsic and extrinsic evidence, the Court disagrees with Beckman's

assertion that a person of ordinary skill in the field would interpret the claim language at issue to

mean that the beads must be "thoroughly" dispersed and re-dispersed "throughout the solution."

The evidence supports GE's proposed construction that only a mere dispersal or re-dispersal of

the beads is required – but not a "thorough" dispersal "throughout the solution."

  The Court, however, agrees with Beckman's contention that the claim terms should be

construed to reflect that the relevant "suspension" aspects of the process must occur in the

"absence of a magnetic field." In regard to this aspect of the claim construction, the claims

themselves indicate that the magnetic field is not applied during suspension and re-suspension.

For example, claim 1 of the '231 Patent states, in relevant part:

> A method of making a product solution containing a nucleic acid . . . comprising
> the steps of:
>
> > precipitating the nucleic acid out of the starting solution in the presence of

the *suspended* magnetically attractable beads . . .

*applying a magnetic field* to draw down the precipitate of the nucleic acid and the associated beads and to form a first supernatant liquid,

separating the precipitate and the associated beads from the first supernatant liquid,

adding a liquid to the precipitate and the associated beads to re-dissolve the nucleic acid and *re-suspend the beads*,

*applying a magnetic field* to draw down the beads and to form a second supernatant liquid, and

separating from the beads the second supernatant liquid as said product solution containing the nucleic acid.

('231 Patent at claim 1, 12:20-41 (emphasis added).) Even though the claim language does not explicitly state that the magnet must be off during the suspension and re-suspension steps, it can be implied from the above language. ACTV, Inc.v. Walt Disney Co., 346 F. 3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim must be considered in determining the ordinary and customary meaning of those terms.") (citation omitted).  The fact that the claim language specifically references when the magnetic field is applied – only *after* the suspension and re-suspension of the beads – supports Beckman's proposal in regard to this piece of the claim construction.  Further, as Beckman argues in regard to the re-suspension step, "the claim language would make no sense if the magnet is never turned off – why would the claim instruct 'applying a magnetic field' if the magnetic field was already applied."  (Beckman Resp. to GE's Claim Construction Br. at 20.)

Similarly, even though they are only examples of the invention, the illustrative figures and written embodiments in the '231 and '946 Patents support Beckman's recommended construction.  For instance, the embodiments described in the specification consistently demonstrate that the step at which the nucleic acids are re-dissolved and the beads are re-

26

suspended takes place "in the absence of a magnetic field." ('231 Patent at Detailed Description of the Invention, 4:33-36, 5:38-41, 6:23-24, 8:28-30.) In regard to the figures, as an example, Figure 1a clearly displays that the beads are suspended before the first "apply magnetic field" notation. Also, a second "apply magnetic field" notation is included again after the re-suspension of the beads. The fact that the figure specifically shows when the magnetic field is applied – only *after* the suspension and re-suspension of the beads – supports Beckman's proposed construction that there is no magnetic field in place during these steps. Moreover, if the magnetic field remained on after the beads were drawn down, there would simply be no need to include a second notation to "apply magnetic field" with the figure.

In conclusion, we construe "suspended" as follows: dispersed in the absence of a magnetic field. In addition, we construe "re-suspend the beads" as follows: "re-disperse the beads in the absence of a magnetic field."

An appropriate Order follows that summarizes the Court's construction of all of the parties' disputed claim terms.